NATIONAL CHIROPRACTIC MUTUAL
INSURANCE COMPANY, Plaintiff,

v.

John DOE, Doe Chiropractic Clinic, D.G.,
M.G., husband of D.G., and G.G., minor
child of D.G., Defendants.

No. A98–0140 CV (JKS).

United States District Court,
D. Alaska.

Oct. 2, 1998.

**1110**

Marc G. Wilhelm, Richmond & Quinn, Anchorage, AK, David S. Sheiffer, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York City, for National Chiropractic Mutual Insurance Company.

Bruce A. Bookman, Perkins Coie, Anchorage, AK, for John Doe and the Doe Chiropractic Clinic.

Phillip Paul Weidner, Phillip P. Weidner & Associates, Anchorage, AK, for D.G., M.G., and G.G.

### ORDER GRANTING MOTION FOR STAY

SINGLETON, Chief Judge.

D.G., M.G., husband of D.G., and G.G., minor child of D.G. (the "tort plaintiffs"), filed an action in state court against John Doe ("Doe") and the Doe Chiropractic Clinic.[1] The tort plaintiffs essentially allege that Doe either sexually assaulted D.G. or led her to believe he had sexually assaulted her, as a result of which D.G. suffered mental and emotional injury for which she and members of her family are entitled to damages.

National Chiropractic Mutual Insurance Company ("National") filed this federal diversity action seeking a declaration of its rights, duties and liabilities under Alaska law to Doe and the tort plaintiffs under a professional liability policy it issued to Doe. National asserts that its policy does not provide coverage for the tort plaintiffs' claims. National is currently defending Doe under a reservation of rights in the underlying state court action.

Doe has filed a motion requesting that this Court dismiss this case and abstain from exercising its discretionary jurisdiction over this case, or, alternatively, stay this action pending the outcome of the underlying state court litigation. See Docket No. 12. The tort plaintiffs filed a notice joining Doe's motion to dismiss or for stay. See Docket No. 15. The motion is opposed. See Docket No. 17. Doe and the tort plaintiffs have filed separate replies to National's opposition. See Docket Nos. 21(Doe), 26 (tort plaintiffs). Additionally, National and the tort plaintiffs have each requested oral argument. See Docket Nos. 23 (tort plaintiffs), 24 (National).[2]

### FACTUAL AND PROCEDURAL BACKGROUND[3]

On May 23, 1996, an action was commenced in the Superior Court for the State of Alaska, Third Judicial District at Anchorage, entitled, *D.G.; M.G., husband of D.G.;*

1. At this stage of the proceedings, all of the claims in this case are merely allegations. Consequently, since the parties could be harmed by publicity regarding the circumstances surrounding the incidents which form the basis for this litigation, the parties have stipulated that the matter should be litigated under seal at least until the time for a jury trial. The Court, having carefully reviewed the record *de novo* and exercised its independent judgment, concludes that the parties' right to privacy, at least during the initial phases of this case, outweigh the community's right to know, as well as that of the news media. The Court will therefore refer to the parties by abbreviations or pseudonyms.

2. The Court has reviewed the record and the parties' briefing and concludes that the parties have fully developed the facts and the law so that oral argument would not be helpful. D.AK. LR 7.1(i); *see United States v. Cheely*, 814 F.Supp. 1430, 1436 n. 4 (D.Alaska 1992), *aff'd*, 36 F.3d 1439 (9th Cir.1994) (discussing oral argument in criminal context but principles remain applicable).

3. The factual background set forth herein is drawn almost exclusively from the allegations contained in the underlying state court complaint. Doe denies that he sexually assaulted D.G. and further denies that he acted negligently. The Court expresses no opinion on the veracity of D.G.'s allegations or Doe's denials.

*and G.G., minor son of D.G. v. John Doe, D.C., individually and as sole proprietor and agent of Doe Chiropractic Clinic; and Doe Chiropractic Clinic,* Case No. 3AN–96–3978 Civil. *See* Docket No. 3, Exh. A (complaint in underlying action). By that action, D.G. and her family members each seek to recover, on their own behalf, compensatory damages in excess of $50,000 against Doe and the Doe Chiropractic Clinic, together with unspecified punitive damages. *Id.* ¶¶ 48–52.

D.G. alleges that she was the victim "of the negligent acts and/or intentional malpractice" of Doe, from whom she sought chiropractic treatment. *Id.* ¶ 1. D.G. claims to have been sexually assaulted by Doe and subjected to inappropriate medical treatment that caused her psychological and emotional distress, both as a violation of her person and as to her concerns for the safety of the child she was pregnant with at the time. *Id.* D.G. also claims to have suffered further psychological distress when the child, G.G., was born with a birth defect. *Id.*[4]

D.G. visited the Doe Chiropractic Clinic on May 23, 1994, after making an appointment with Doe related to an injury she had received in an automobile accident. *Id.* ¶¶ 6–8. At the time, D.G. also had a lump in her left breast. *Id.* ¶ 9. Prior to her treatment by Doe, D.G. informed him that she had just had a complete physical from her family practitioner, that the breast lump had been discovered, and that she was scheduled to have a mammogram performed the following day. *Id.* D.G. did not ask Doe to perform a breast examination on her. *Id.* Doe inquired as to whether D.G. was taking birth control and whether she was trying to get pregnant. *Id.* ¶ 10. Doe also told D.G. she reminded him of his ex-wife. *Id.*

Doe examined D.G.'s back and then had her lie down on her back. *Id.* ¶ 12. Standing behind D.G.'s head, Doe examined her neck and shoulders, and then asked her to lower her examination gown. *Id.* D.G. lowered her gown several inches, but left her breasts covered. *Id.* ¶ 13. Standing behind D.G.'s head, Doe pulled the gown below

D.G.'s breasts. *Id.* ¶ 14. Then, without telling D.G. what he was about to do and without asking D.G. whether she wanted him to examine her breasts, he grabbed her left breast with one hand, placing the palm of his hand over her breast and feeling her breast with his fingers. *Id.* Only D.G. and Doe were present in the examination room. *Id.* ¶ 15.

After fondling D.G.'s left breast, Doe grabbed D.G.'s right breast with his other hand, palming it and feeling it in the same manner. *Id.* ¶ 16. When Doe removed his hands, D.G. asked him if he had felt the lump, and he said he had not. *Id.* ¶ 17. Doe then moved down and pushed on D.G.'s pubic mound, indicating that he wanted to see if the applied pressure would cause pain in her back. *Id.* ¶ 18.

Doe next took a series of x-rays of D.G. in various positions. *Id.* ¶ 19. During one x-ray, D.G. was told to sit down, and the head of the machine was placed between her knees. *Id.* Doe told her to spread her legs wider, "so that her thigh muscles would not interfere with the picture." *Id.* D.G. returned to Doe's office the following day for her follow-up appointment, but left before the physical part of the exam. *Id.* ¶ 20. Two days later, Doe personally contacted her at home by telephone. *Id.*

The tort plaintiffs' complaint against Doe and the Doe Chiropractic Clinic contains six causes of action. *Id.* ¶¶ 25–45. The first cause of action is a medical malpractice claim, alleging that the breast examination, the pressure applied to D.G.'s pubic mound, and the x-rays taken of D.G.'s pelvic area, constituted conduct by Doe which violated the appropriate standard of medical practice for chiropractors in the community. *Id.* ¶¶ 25–29. The second cause of action is a sexual assault claim, alleging that the same acts, committed under the guise of professional chiropractic treatment, constituted sexual assault. *Id.* ¶¶ 30–33.

The third cause of action alleges that Doe, in touching and feeling D.G.'s breasts and pubic mound, and in taking x-rays of her

---

4. G.G. was born with hyperspoedia, a deformity which was corrected through a surgical operation. *Id.* ¶ 23.

pelvic area, negligently inflicted emotional distress on D.G. *Id.* ¶¶ 34–35. Respectively, the fourth and fifth causes of action are for breach of fiduciary duty and "breach of duty." *Id.* ¶¶ 36–43. Finally, the sixth cause of action alleges that Doe's conduct constitutes the tort of outrage. *Id.* ¶¶ 44–45.

National issued Professional Liability (Chiropractic Malpractice), Policy No. MP 05 11 20 (the "Policy") providing coverage to Doe and the Doe Chiropractic Clinic, for the policy period of October 1, 1994, to October 1, 1995. *See* Docket No. 3, Exh. B. The Policy affords, among other things, limits of liability of $1 million per person and $1 million in the aggregate. *Id.* Following commencement of the underlying tort action against Doe, National appointed the law firm of DeLisio, Moran, Geraghty & Zobel, P.C., to defend and represent Doe's interests. *See* Docket No. 3, ¶ 17 (complaint). The defense was afforded by National subject to its right to deny coverage. *Id.*

The Policy provides that coverage is only afforded as follows:

#### Coverage Agreement

Within the limits of liability shown on the Declaration, **we** will pay all sums to which this insurance applies and which you become legally obligated to pay as **damages** because of an **injury**. The **injury** must be caused by an accident arising out of the providing or failure to provide **professional services** to a patient during the policy period. The **injury** also must be caused by **you,** or another **insured,** under this policy.

*See* Docket No. 3, Exh. B at 7 (emphasis in original). The terms "damages," "injury" and "professional services" are defined in the Policy as follows:

#### Definitions

\*    \*    \*    \*    \*    \*

2.  **Damages** means the monetary portion of any judgment, award or settlement, but does not include:

    (a) punitive or exemplary damages, any damages that are a multiple of compensatory damages, fines or sanctions; or

    (b) judgments or awards considered uninsurable by law.

3.  **Injury** means bodily injury, sickness, disease or death sustained by any one person.

4.  **Professional services** means only those services usually and customarily furnished by chiropractors. It does not include any services furnished by an **insured** as a practitioner of any other healing or treating art.

*Id.* (emphasis in original). The Policy also provides for the following exclusions from coverage:

#### Exclusions

Despite any other provision of this policy, this policy does not apply to **injury** resulting in whole or in part from:

A.  An act or omission violating any federal or state statute, or any county or municipal ordinance governing the commission of a crime.

    \*    \*    \*    \*    \*    \*

C.  The use of X-ray (except for diagnostic purposes).

    \*    \*    \*    \*    \*    \*

J.  False imprisonment; false arrest; libel; slander; defamation; invasion of privacy; sexual impropriety; sexual intimacy, or assault.

    \*    \*    \*    \*    \*    \*

O.  The intentional infliction of **injury**.

    \*    \*    \*    \*    \*    \*

R.  This policy does not apply to punitive or exemplary damages, fines, penalties imposed by law, or matters uninsurable under law pursuant to which this policy is construed.

*Id.* at 8 (emphasis in original).

D.G.'s tort action is currently being actively litigated in state court. *See* Docket No. 12, Affidavit of Bruce A. Bookman. Numerous documents have been produced, both Doe and D.G. have been deposed at length, and a trial-setting conference is scheduled in state court. *Id.* Summary judgment motions have been filed on various aspects of D.G.'s claims and are pending while the case is referred by the state court to the Expert Advisory Panel. *Id. See also* Docket No. 21,

Exh. A (Order Re: Issues to be Reviewed by Expert Advisory Panel).[5]

On May 1, 1998, almost two years after the filing of the tort plaintiffs' complaint against Doe in state court, National filed this action seeking a judgment declaring that it has no obligation to indemnify or pay any damages on behalf of Doe or the Doe Chiropractic Clinic sustained in the state tort action. National is also seeking a declaration that it is entitled to withdraw the defense currently being afforded.[6] *See* Docket No. 3, ¶ 21. National's complaint contains seven causes of action. *Id.* ¶¶ 22–51. In its first cause of action, National argues that any injuries suffered by D.G. were the result of Doe's intentional conduct not involving any professional license or skill, and that such conduct is beyond the scope of coverage set forth in the Policy. *Id.* ¶¶ 23–26. In its subsequent causes of action, National primarily highlights various definitions and exclusions contained in the Policy which it believes negate or minimize any obligation to pay damages recovered by the tort plaintiffs. *Id.* ¶¶ 27–51.

## DISCUSSION

Doe's motion contains two requests. First, Doe suggests that this Court abstain from exercising jurisdiction over this case. In the alternative, Doe moves to stay this action pending the outcome of the underlying tort action. This Court has previously set out its views on the propriety of accepting jurisdiction in declaratory judgment actions in insurance coverage litigation in *Ryan v. Sea Air, Inc.*, 902 F.Supp. 1064 (D.Alaska 1995). The Court continues to hold the opinions expressed in that order, particularly in view of their vindication in *Government Employees Insurance Co. v. Dizol*, 133 F.3d 1220 (9th Cir.1998) (*en banc*). The Court concludes that it should exercise jurisdiction under the Declaratory Judgment Act, but that the entry of a stay would be appropriate under the facts and circumstances of this case.

The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), grants discretion to the district court to grant declaratory judgments in appropriate cases and to refuse to entertain inappropriate actions requesting a declaratory judgment.[7] The DJA does not itself confer federal subject matter jurisdiction, but rather there must be an independent basis for such jurisdiction. *See Staacke v. United States Secretary of Labor*, 841 F.2d 278, 280 (9th Cir.1988). Here, subject matter jurisdiction is properly predicated on diversity of citizenship. *See* 28 U.S.C. § 1332.[8]

There is no question that there are cases and controversies dividing the parties regarding National's obligation, if any, to indemnify and defend Doe against the tort plaintiffs' claims. Thus, this would appear to be a perfect case for a declaratory judgment unless certain prudential considerations

5. Alaska has statutorily enacted and established mandatory pretrial review of medical malpractice claims by an expert advisory panel. *See* AS 09.55.536. *See also Keyes v. Humana Hosp. Alaska, Inc.*, 750 P.2d 343, 346–48 (Alaska 1988) (discussing role of expert advisory panel).

6. The Alaska Supreme Court recently accepted certification of a number of related issues in *C.P., et al. v. Allstate Insurance Co., et al.*, Case No. J96–0017 CV (JKS). In part, that case involves the interplay between claims of negligence and sexual assault. The Alaska Supreme Court has agreed to consider whether the insurer's separate duty to defend survives a judicial determination in a declaratory judgment action that there is no coverage, and if not, what the measure of damages is where the insurer obtains a declaratory judgment and then drops the defense of the tort action. In the course of deciding those issues, the court will also probably address the appropriate timing of a declaratory judgment action in relation to the underlying tort case. The court may also venture an opinion on the impact of collateral estoppel in rendering a determination on whether the declaratory judgment action should be stayed while the tort case progresses. This Court is of the view that these are unsettled questions in Alaska.

7. 28 U.S.C. § 2201(a) provides:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

8. National is an Iowa corporation with its principal place of business located in West Des Moines, Iowa. All defendants are residents of the State of Alaska. The amount in controversy exceeds $75,000, exclusive of interest and costs.

counsel caution. *See Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941). In order to evaluate the prudential considerations it is necessary to look at the DJA as it has been interpreted by the United States Supreme Court and the Court of Appeals for the Ninth Circuit.

At common law a party could not bring an action to resolve a dispute until that party was entitled to a "coercive remedy," such as a judgment for damages or an injunction. *See* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2751, at 568 (2d ed.1983). The DJA and complementary Rule 57 of the Federal Rule of Civil Procedure were intended to address situations where an actual case or controversy exists, but that case or controversy has either not reached the stage where any party may seek a coercive remedy, or reached the stage where a party may sue for a coercive remedy but elects not to do so in order to achieve a tactical advantage over the other party. As one authority puts it:

> The remedy made available by the Declaratory Judgment Act and Rule 57 is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages and to afford one threatened with liability an early adjudication without waiting until his adversary should see fit to begin an action after the damage has accrued. It relieves potential defendants "from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never." It permits actual controversies to be settled before they ripen into violations of law or a breach of contractual duty and it helps avoid multiplicity of actions by affording an adequate, expedient, and inexpensive means for declaring in one action the rights and obligations of litigants.

10A *id.* at 569–71.

Measured against this test, disputes between a liability insurer and its insured, where the insured is sued by a third party and the insurer believes that the claim is outside of coverage so that the insured is entitled to neither an indemnity nor a defense, would appear to present the paradigm situation in which a declaratory judgment should be available. *See* 10A *id.* § 2760, at 658–69. In such a situation, the insurer is faced with limited options. *See generally Sauer v. Home Indem. Co.*, 841 P.2d 176, 182–83 (Alaska 1992) (discussing legal options and obligations facing insurer where there is some doubt regarding the duty to defend).

First, the insurer may unconditionally defend, thereby waiving any coverage defenses. Second, the insurer may tender a defense under a reservations of rights, but only if the insured agrees. A rational insured, represented by counsel, would hesitate to agree to such a reservation of rights. If the insured does not consent to a non-waiver agreement, or to a defense under a reservation of rights, then the insurer must inform the insured that she may retain her own attorney at the insurer's expense. If the insured agrees to a reservation of rights or defends with her own attorney, the insurer is free to contest coverage when sued on the policy after the insured suffers an adverse verdict or enters into a settlement assigning her rights to the plaintiff. The latter result is most frequent. Over ninety percent of civil litigation results in settlement.

A judgment is only valuable if it is collectible. Even solvent defendants probably have their assets well concealed by the time they suffer an adverse verdict in tort litigation. Thus available insurance coverage is of paramount importance to a personal injury plaintiff in most cases. Absent some hope of collecting from an insurer, only a rare plaintiff will proceed to litigate unless the defendant is a major corporation. By the same token, even solvent defendants who lack the resources to be "self-insured" are hesitant to participate in modern day litigation unless protected by insurance.

Where coverage is in doubt both the plaintiff and the insured are strongly motivated to settle and fight the battle out with the insurer. Of course, they will hope to structure the settlement in a manner that will "estop" the insurer from denying coverage. *See Sauer*, 841 P.2d at 183–84 (where insurer fails to give the insured timely notice of the basis for its denial of coverage and defense, it is estopped to deny coverage at a later time).

The insurer's dilemma is enhanced because today any action by the plaintiff as assignee of the insured's rights after settlement will as a matter of routine include tort claims for breach of the covenant of good faith and fair dealing and punitive damages. *See, e.g., O.K. Lumber Co., Inc. v. Providence Washington Ins. Co.,* 759 P.2d 523, 525–26 (Alaska 1988) (insurer does not owe third party plaintiff independent duty of good faith and fair dealing, but insured may assign any such claim to third party plaintiff); *Afcan v. Mutual Fire, Marine and Inland Ins. Co.,* 595 P.2d 638, 647 (Alaska 1979) (same).

There are nevertheless numerous published decisions in which courts have declined to grant declaratory judgments under circumstances similar to those presented in this case. None of those decisions are from Alaska. The reasons set forth by the various courts in support of their ultimate conclusions might nevertheless help this Court in reaching a decision regarding abstention or the entry of a stay.

The DJA is deliberately cast in terms of permissive, rather than mandatory, authority. *See Public Serv. Comm'n of Utah v. Wycoff Co., Inc.,* 344 U.S. 237, 250, 73 S.Ct. 236, 97 L.Ed. 291 (1952); *Brillhart v. Excess Ins. Co. of Am.,* 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). *See also Wilton v. Seven Falls Co.,* 515 U.S. 277, 286–87, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) ("The [DJA's] textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface."). If a party properly raises the issue, the district court should make a sufficient record of its reasons for exercising or not exercising jurisdiction to enable appropriate appellate review. *See United Nat'l Ins. Co. v. R & D Latex Corp.,* 141 F.3d 916, 919 (9th Cir.1998); *Dizol,* 133 F.3d at 1225. This record should address the reasons courts have relied upon in denying relief. The factors to be considered in exercising this discretion (the "*Dizol* factors") are:

(1) To avoid the needless determination of state law issues;

(2) To discourage the filing of declaratory actions as a means of forum shopping;

(3) To the avoid duplicative litigation;

(4) To resolve all aspects of the controversy in a single proceeding if possible;

(5) To avoid intervention unless the declaratory action will serve a useful purpose in clarifying the legal relations at issue;

(6) To avoid procedural fencing or permitting one party to obtain an unjust res judicata advantage at the expense of the other;

(7) To avoid entanglement between the federal and state court systems; and

(8) To avoid jeopardizing the convenience of the parties.

*See Dizol,* 133 F.3d. at 1225 & n. 5 (internal citations omitted).[9] In *Wilton,* the Supreme Court concluded that if the basis for declining to proceed is the pendency of a state proceeding, a stay will often be the preferable course, insofar as it assures that the federal action can proceed without risk of a time bar if the state case, for any reason, fails to resolve the matter in controversy. *See* 515 U.S. at 288 n. 2, 115 S.Ct. 2137, 132 L.Ed.2d 214.

▮ In dealing with these prudential considerations it is necessary to distinguish between the following: (1) considerations that are specific to the declaratory judgment remedy and would be persuasive reasons for taking or declining jurisdiction whether the action was commenced in federal or state court; (2) considerations that do not relate directly to the declaratory judgment remedy but actually address the question whether the matter should be in state or federal court; and (3) considerations that do not relate to the declaratory judgment remedy or the court in which it should be sought, but affect only the timing of the remedy in light of other related litigation between the parties. Failure to keep these various concepts separate has led to some confusion in the reported cases.

---

9. The first three of these factors emanate from the United States Supreme Court's opinion in *Brillhart.* In the Ninth Circuit, however, these three factors are not exhaustive. *See Dizol,* 133 F.3d at 1225 n. 5. The additional factors are offered to provide further guidance.

If there are "parallel state proceedings" involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court. *See Dizol,* 133 F.3d at 1225 (citing *Chamberlain v. Allstate Ins. Co.,* 931 F.2d 1361, 1366–67 (9th Cir.1991)). However, the pendency of a state court action does not, of itself, require a district court to refuse federal declaratory relief. *See id.* (citing *Chamberlain,* 931 F.2d at 1367); *accord* FED.R.CIV.P. 57 (the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate). Indeed, there is no presumption in favor of abstention in declaratory actions generally, nor in insurance coverage cases specifically. *See Dizol,* 133 F.3d at 1225.

Alaska has adopted a statute regulating declaratory judgments that is for all intents and purposes identical to the DJA, *see* AS 22.10.020(g), and the Alaska Supreme Court has adopted as Rule 57 of the Alaska Rules of Civil Procedure, a rule virtually identical to its federal counterpart. *See Jefferson v. Asplund,* 458 P.2d 995, 997 (Alaska 1969). The Alaska Supreme Court will consider federal precedent pertinent in evaluating the state statute. *See id.* at 997 n. 7. Thus, if we look only to general considerations governing declaratory judgments, the same rules should apply whether the action is commenced in state court or in federal court. The Alaska Supreme Court has quoted Professor Borchard for the following proposition:

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

*Id.* at 997–98.[10] In short, courts should avoid purely advisory opinions and hypothetical questions, as well as moot questions. *See id.* at 999.

In this action, there is a real controversy over coverage and the availability of a defense to Doe against the tort plaintiffs' claims. *See American States Ins. Co. v. Kearns,* 15 F.3d 142, 143 (9th Cir.1994) (citing *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 893 (9th Cir.1986)). The parties are uncertain regarding the outcome and all are before the Court. Thus a final judgment in this action could resolve once and for all the coverage dispute and the right to a defense. Additionally, a final judgment could answer ancillary questions which might arise should either Doe or the tort plaintiffs, as assignees of Doe, sue National later for breach of the covenant of good faith and fair dealing, or sue for violation of some fiduciary obligations arising out of actions National took while trying to protect its rights to limit a defense to claims within the Policy's coverage. The case is certainly not moot. Thus, if we look only to those considerations which generally govern courts in deciding whether to grant or withhold relief, this case seems appropriate for a declaratory judgment.

It is possible, however, that a declaratory judgment might be an appropriate remedy to resolve an existing dispute, but the United States District Court an inappropriate forum in which to resolve the dispute. These concerns have nothing to do with declaratory judgments as such, but call into question considerations such as comity and federalism. Such considerations were the primary concern of the dissenters in *Dizol. See* 133 F.3d at 1229–37 (Alarcon, J., dissenting). Necessarily, these considerations can only be addressed and evaluated when assessed against the background of the particular state in question.

At the outset, it is important to stress that neither the Alaska Legislature nor the Alaska Supreme Court has ever hinted that routine questions of contract law, including in-

---

**10.** This two factor test really addresses the vast majority of the considerations raised by the *Dizol* factors. The second, third, fourth, fifth and eighth *Dizol* factors essentially address the importance of providing a convenient and timely remedy to avoid costs associated with delay and uncertainty. If the declaratory action duplicates existing litigation or reflects impermissible forum shopping, then it is clearly not reasonably necessary to assure the parties a speedy remedy. The Alaska two factor test does not address considerations relating to the choice of a state or federal forum, or the timing of such proceedings.

surance contract law, should be decided in state court rather than federal court. Alaska does not permit a direct action against an insurance carrier, so necessarily coverage questions and liability questions cannot be decided in the same action. While Alaska has an insurance code governing the rights and responsibilities of insurers and their agents versus the insured and third party claimants, the Alaska Supreme Court has held that these statutes do not provide a private cause of action. *See O.K. Lumber*, 759 P.2d at 526–28. Unlike some states, Alaska has no statute prohibiting an insurer from seeking a declaratory judgment while a liability action is pending. *See* 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2760, at 666 & n. 12.

In candor, it should be noted that considerations of comity and federalism typically arise where a litigant seeks to use a declaratory judgment action in federal court to trump or stymie a pending criminal prosecution in state court, a state administrative proceeding, or other action in which the federal court is in effect asked to serve as an appellate court over a state trial court of equal dignity or a state administrative agency. The State of Alaska is not a party to any pending proceeding involving these parties. Nor is this Court being asked to resolve difficult questions of state law better left to the state courts. The Alaska Supreme Court has wisely provided in Appellate Rule 407 a procedure for certification of such questions, and has in fact addressed a number of insurance issues in the past. *See* ALASKA R.APP.P. 407.[11]

There is nothing in the record of this case or of those previously certified cases to suggest that the parties would have received a more rapid resolution of the issues had the cases percolated up through the state sys-

tem, as opposed to being initially brought in federal court and then certified to the Alaska Supreme Court. In fact, given the respective case loads in state and federal court, it is likely that an issue will reach the Alaska Supreme Court more rapidly if initially brought in this Court. Where the Alaska Supreme Court declines certification, that provides almost conclusive evidence that either it does not consider the issues to be disputed under current law, *see St. Paul Fire & Marine Insurance Co. v. F.H.*, 117 F.3d 435, 437–38 (9th Cir.1997) (trial court properly considered Alaska Supreme Court's refusal of certification in determining whether to exercise jurisdiction),[12] or that the issues while debatable under state law are not ripe for appellate resolution of the dispute. *See Benner v. Wichman*, 874 P.2d 949 (Alaska 1994).

This Court rejects the proposition, advanced by Doe, that the presumption favoring abstention applies to this action. *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 126–27, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968) (pendency of another suit in state court does not bar declaratory relief in federal court if the issues in the declaratory action will not necessarily be determined in state court). The parties and legal issues in the state court proceeding and this proceeding are substantially different. In *Dizol*, the Ninth Circuit was concerned that "federal courts should generally decline to entertain *reactive* declaratory actions." *See* 133 F.3d at 1225 (emphasis added). A "reactive" or "defensive" declaratory judgment action is typically a diversity federal action commenced by an insurer that has already been sued in state court, either by the injured third party or the insured. In

---

**11.** The Ninth Circuit encompasses the western states. The bulk of its business comes from one state—California. It is understandable that considerations peculiar to California dominate the thinking of some judges. Until very recently, *California did not permit the certification of open questions of state law to the California Supreme Court for determination. See, e.g., Nunez v. City of San Diego*, 114 F.3d 935, 942–43 (9th Cir.1997). Effective January 1, 1998, California adopted a certification procedure in Rule 29.5 of the California Rules of Court, which the Ninth Circuit has already utilized. *See Los Angeles Alliance For Survival v. City of Los Angeles*,

157 F.3d 1162 (9th Cir.1998). Prior to the enactment of this procedure, in diversity cases arising in California, the Ninth Circuit routinely acted as the effective determinator of California law. In Alaska, such issues have for some time been certified to the Alaska Supreme Court.

**12.** As this Court recalls, the Alaska Supreme Court declined interlocutory review until the issues had been thoroughly debated in the trial courts. The lower courts did not divide along federal and state lines. One federal judge and one state judge went one way, another federal judge and state judge went the other.

this case, no state coverage action is pending or anticipated. The presumption favoring abstention does not apply to this case because the evil sought to be prevented by the presumption is not present.

■ Elimination of the presumption favoring abstention brings us directly to consideration of the prudential concerns which govern the exercise of this Court's discretion. The Court is obligated to determine whether abstention or the entry of a stay is appropriate by applying the considerations set forth in *Dizol.* The reasoning which supports this Court's conclusion that the entry of a stay is appropriate is set forth in the following factor by factor analysis: .

*Avoiding Needless Determination of State Law Issues.* This consideration primarily concerns the unnecessary duplication of trying the same legal claim in state and federal court. Weighing the impact of this first factor in *Continental Casualty Co. v. Robsac Industries,* 947 F.2d 1367 (9th Cir.1991), *overruled on other grounds, Dizol,* 133 F.3d at 1227, the Ninth Circuit made clear that the concern addressed in this factor is with unsettled issues of state law, not fact-finding in the specific case. *See* 947 F.2d at 1371. The *Robsac* court found that the factor weighed in favor of the federal court abstaining, noting that "[t]he precise state law issues at stake in the present case are the subject of a parallel proceeding in state court. In the federal case, a diversity action, California law provides the rule of decision for all of the substantive questions." *Id.*

The policy of avoiding unnecessary determinations of state law issues is not present in this declaratory action. The underlying state court action is a tort suit to which National is not a party, and its obligation, in the abstract, to provide Doe coverage and a defense for covered claims is not at issue. *See Brillhart,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (trial court must carefully inquire into the issues being litigated in state court to determine whether the claims of all parties in interest can be adequately resolved in the pending proceeding in state court). As this Court previously noted in *Ryan,* Alaska does

not permit a direct action against an insurer in this kind of case. *See* 902 F.Supp. at 1067–68. While Alaska has a declaratory judgment act patterned on the federal act, resolving the matter here does not increase the number of cases or lead to multiplicity of litigation regarding the legal issues in dispute. *See id.* at 1067. Moreover, in the absence of recourse by Doe to the state declaratory judgment procedure, its availability is not a hindrance to the exercise of declaratory judgment jurisdiction in this Court. *See Continental Cas. Co. v. Coastal Sav. Bank,* 977 F.2d 734, 738 (2d Cir.1992).[13]

Hence, the Court concludes that this factor does not favor abstention. If there were unsettled issues of state law they could easily be certified to the Alaska Supreme Court. *See* ALASKA R.APP.P. 407. The Alaska Supreme Court has frequently accepted certification of insurance coverage issues from this Court and the Ninth Circuit. *See, e.g., D.D. v. Insurance Co. of N. Am.,* 905 P.2d 1365 (Alaska 1995). *See also C.P. v. Allstate Ins. Co.,* Case No. J96–0017 CV (JKS) (certified questions relating to insurance coverage currently pending before the Alaska Supreme Court).

■ *Discouraging Forum Shopping.* Forum shopping would only exist if Doe had commenced a declaratory judgment proceeding in state court against National under parallel state law, *see* AS 22.10.020(g), and, perhaps concerned at some preliminary rulings by a state judge, National had filed this federal action. Doe did not file a declaratory judgment action in state court. As noted in *Dizol,* "we know of no authority for the proposition that an insurer is barred from invoking diversity jurisdiction to bring a declaratory judgment action against an insured on an issue of coverage." 133 F.3d at 1225 (quoting *Aetna Cas. and Sur. Co. v. Merritt,* 974 F.2d 1196, 1199 (9th Cir.1992)). Improper forum shopping occurs only where the declaratory judgment is "defensive" or "reactive." As previously noted, in this case, no other coverage action is pending or anticipat-

---

**13.** The Court recognizes that *Continental* relied in part on certain principals repudiated by the Supreme Court in *Wilton.*

ed. There is no reason for this Court to abstain from hearing this declaratory action based upon consideration of this factor.

*Avoiding Duplicative Litigation.* Where an insured is sued on a theory that may or may not be within the scope of her insurance coverage and the insurer and insured are unable to agree on coverage, two actions are unavoidable in Alaska. *See Ryan,* 902 F.Supp. at 1067–68 (citing *CHI of Alaska, Inc. v. Employers Reinsurance Corp.,* 844 P.2d 1113 (Alaska 1993)). Coverage questions simply will not be resolved in the underlying state court action. The issues and parties are different, and National cannot and should not be joined to the underlying state court action. The Alaska Supreme Court addressed this question in *CHI of Alaska* and concluded that where the insured and insurer have a conflict of interest over coverage, no decision in the underlying tort action will bind either. *See* 844 P.2d at 1119. In other words, both will be able to litigate or relitigate any common fact in a separate coverage action.

Doe disagrees with this Court's analysis of *CHI of Alaska.* In Doe's view, *CHI of Alaska* dealt with the situation where the insurer and the insured dispute coverage and the insurer forces an attorney on the insured. The attorney's primary loyalty is to the insurer and the attorney might consciously or unconsciously structure the tort case to establish a coverage defense. In such a circumstance, it would be unfair to make the result of the tort litigation binding on the insured. Where, as is the case in this matter and will be the case in those matters following *CHI of Alaska,* the insured has control of the litigation by choosing her own lawyer, the conflict of interest disappears. In Doe's view, in such a case, an adverse decision in the tort case would no longer bind the insurer who was not in privity on that issue, but would bind the insured who controlled the defense.

Doe's analysis, while plausible, overlooks the problem the Alaska Supreme Court was addressing in *CHI of Alaska.* Specifically, Doe's analysis would frustrate the Alaska Supreme Court's goal of assuring that the tort case is prosecuted, defended and settled on its merits, free of any concerns about the separate coverage dispute. It is important to stress that the conflict of interest between the insured and the insurer does not depend on having a common lawyer and does not disappear when each has its own lawyer. The conflict is inherent in the very nature of any relationship between an insured and insurer. The two are allies in seeking to defeat or diminish the plaintiff's claims, but adversaries in resolving coverage disputes.

Realistically, civil litigation does not frequently terminate in a trial. As previously noted, in more than ninety percent of the cases, litigation ends in some form of settlement. This is not because the parties ultimately come to agree on the facts or the law. Settlement is achieved because the parties simply cannot afford to disagree and wish to hedge against the uncertainties presented in any trial. The parties must therefore weigh the likelihood of success on the merits against the likelihood of collecting any judgment in determining their settlement positions.

Naturally the cost of litigation plays a significant part in this calculation. Where the defendant lacks a pocket deep enough to compensate the plaintiff for all debatable damages, the significance of insurance becomes paramount in evaluating the settlement value of a given case. Where insurance coverage is possible but debatable, the settlement value of the underlying tort case is necessarily distorted. The cost of modern day tort litigation is so high that plaintiffs, no matter how strong their case and how sure their damages, simply cannot afford to litigate a defended case unless they can look to a "deep pocket" for recovery. By the same token, a private defendant, no matter how solvent, cannot afford to defend a vigorously litigated case unless there is hope that an insurer will pay the defense costs.

Consequently, if the insured knows that the result in the tort case will hamper her coverage hopes, even if the result will not increase those hopes, her strategic and tactical decisions are going to be guided by the pending coverage dispute. If the outcome of the tort suit will affect the outcome of the coverage dispute in any way, the tort suit will not be resolved on its intrinsic merits. The resolution will be distorted by concerns about coverage and how potential resolution might

influence resolution of the coverage dispute. Typically the insured and the plaintiff enter into some form of collusive settlement agreement which they structure to estop the insurer. Where this is impossible, they would nevertheless be expected to structure a settlement to avoid defeating the coverage on which both of their hopes depend.

It appears to this Court that the Alaska Supreme Court recognized these concerns and sought to make the coverage dispute irrelevant to the resolution of the merits of the tort case by freeing both the insured and the insurer from any fear that the tort case result would adversely affect the outcome of the coverage case. The Alaska Supreme Court intended this result to follow regardless of who had control over the tort litigation. Neither a result of the tort case favorable to the insured, nor one unfavorable to the insured, should be binding on either party in the coverage dispute. *See Hoffman v. State,* 834 P.2d 1218 (Alaska 1992) (discussing the circumstances under which collateral estoppel will work against a party in subsequent litigation); *Alaska Foods, Inc. v. Nichiro Gyogyo Kaisha, Ltd.,* 768 P.2d 117 (Alaska 1989) (same). *See also Sauer,* 841 P.2d at 183–84 (discussing the unavailability of collateral estoppel under related but distinguishable circumstances).

There are further reasons why the state court proceedings will not likely reach any results relevant to the coverage dispute. First, it is inconceivable that the plaintiff in the underlying action and the insured would structure a settlement to defeat coverage. Of course, every effort will be made to structure the settlement to establish coverage by prejudicing the insurer, but *CHI of Alaska* was intended to prevent that result. Second, if the underlying case actually went to trial, it would normally be presented to a jury by a general verdict which would obscure any jury guidance on the coverage issues in dispute between the insured and the absent insurer. While a special verdict is possible, under Doe's analysis of *CHI of Alaska,* neither the insured nor the plaintiff could possibly benefit from a jury determination in the tort case

resolving coverage claims in favor of the insurer. A determination that favored the plaintiff and the insured would not be binding on the insurer; a determination that hurt the plaintiff and the insured would be binding on them. Both the plaintiff and the insured would be highly motivated to present the case to the jury in a manner that would minimize this risk.

This is not a case in which the dispute between the insured and the insurer involves policy defenses. Nor is it a dispute that raises issues of insurance law entirely unrelated to the issues underlying the tort claim, such as permissive use of an automobile, or whether the use was for business or pleasure. Doe is accused of pressing on D.G.'s pubic mound during the examination, inappropriately touching her breasts, and x-raying her with her legs spread apart. Doe acknowledges that the physical acts alleged occurred. *See* Docket No. 21 at 7. However, Doe contends that each of these acts was done in a good faith effort to treat D.G., while D.G. contends that the acts were done not for treatment but to satisfy Doe's salacious impulses. Alternatively, D.G. also contends that these same acts were done negligently and that Doe's actions negligently inflicted emotional distress on her.

Contrary to National's suggestion, Doe's actions are distinguishable from the sexual assault of Dr. Ake which was the basis of the opinion in *D.D. v. Insurance Co. of North America,* 905 P.2d 1365 (Alaska 1995). Dr. Ake was accused of placing his penis in the vagina of his patients during their physical examinations, conduct which, if true, could only constitute an intentional sexual assault rather than medical treatment. In this case, there is the possibility that a fact-finder may conclude that Doe's examination of D.G. was valid, professional chiropractic treatment. *See* Docket No. 21, Exh. A (Order Re: Issues to be Reviewed by Expert Advisory Panel).

Of course, a medical exam that was a valid professional chiropractic treatment might still be a sexual assault under Alaska law if D.G. did not give an informed consent.[14]

---

**14.** One of the errors that infects the discussion in this case is the assumption that Doe could not have committed a sexual assault on D.G. unless he intended to gratify his sexual desires. Alaska

law is to the contrary. An intent to obtain sexual gratification is not an element of criminal sexual contact. *See Braun v. State,* 911 P.2d 1075,

Even so, a fact-finder might conclude that Doe "negligently" frightened D.G., provoking mental and emotional injury. The outcome of the state tort case will depend on the factual determination of why Doe conducted his examination and whether his actions negligently or intentionally harmed D.G. Other factual issues may turn on the extent to which D.G. consented to be touched by Doe during the examination.

Rendering an informed decision on the legal issue of coverage will turn on the same factual issues. If Doe committed an intentional, nonconsensual touching, then according to the terms of the Policy and the holding of *D.D.*, the claim might not be covered.[15] However, if Doe's actions were valid, professional chiropractic services within the scope of D.G.'s informed consent, yet Doe negligently caused emotional distress to D.G. who may have thought she was assaulted or improperly x-rayed, then the claim would appear to be covered. Without rendering a factual determination on the issue of whether Doe acted negligently or intentionally, there is essentially no way for this Court to evaluate National's coverage claim.

Should this Court proceed to resolve the coverage issue and National ultimately prevail, there are two possibilities: (1) National would prevail by virtue of summary judgment entered in its favor; or (2) National would prevail at trial after a jury verdict on the coverage issues. It is important to stress that the coverage case will not turn exclusively on an evaluation of D.G.'s pleadings in the state court action. At least as to National's duty to defend, the duty depends not only on the pleadings, but also on any facts known to National or reasonably discoverable by National. *See Alaska Pac. Assurance Co. v. Collins*, 794 P.2d 936, 945 (Alaska 1990) (citing *Smith v. Great Am. Ins.*

*Co.*, 629 P.2d 543, 546 (Alaska 1981) (quoting *National Indem. Co. v. Flesher*, 469 P.2d 360, 366 (Alaska 1970))). Facts outside the pleadings cannot defeat the duty to defend, but they may create it. *See id.* Since anything developed in the tort case might have been discoverable by National had it conducted a reasonable investigation, it would appear that to prevail on the duty to defend issue, National would have to prove that Doe in fact sexually assaulted D.G. It would not be sufficient for National to merely establish that D.G. thought Doe assaulted her and that her pleadings expressed those thoughts. In fact, if D.G. mistakenly thought Doe assaulted her and suffered damages, it would appear that Doe might be covered. Similar problems were considered by the Supreme Court of California in *Montrose Chemical Corp. v. Superior Court*, 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993).

This Court has rejected Doe's theory that an adverse decision in the tort case might defeat the coverage claims. The converse is not necessarily true. A decision adverse to Doe in this coverage case resting on a determination either as a matter of law by summary judgment, or as a matter of fact by a jury, that Doe sexually assaulted D.G. might be binding upon Doe in the underlying tort case since all of the requisites for collateral estoppel would be present. *See Drickersen v. Drickersen*, 546 P.2d 162, 169–70 (Alaska 1976). This concern has motivated some courts to delay a result in the declaratory judgment case until after the tort case is resolved. *See, e.g., Montrose Chem. Corp.*, 24 Cal.Rptr.2d 467, 861 P.2d at 1162–63; *Morris v. Farmers Ins. Exch.*, 771 P.2d 1206, 1210 (Wyo.1989) (action stayed because both the declaratory judgment action and underlying case required fact-finder to determine if insured acted intentionally).

1078–79 (Alaska App.1996). It is true that the statute exempts from characterization as "sexual contact" acts "performed for the purpose of administering a recognized and lawful form of treatment that is reasonably adapted to promoting the physical or mental health of the person being treated." *See* AS 11.81.900(54)(B)(ii). However, a jury could find that a recognized medical or chiropractic treatment that involved touching the sexual organs of a patient was not "reasonably adapted" if it did not involve the patient's informed consent. D.G. vigorously disputes giving Doe "consent" to perform the acts of which she presently complains.

**15.** The majority opinion in *D.D.* distinguishes between coverage terms and exclusions, and suggests that the same act might involve the rendering of professional services under a malpractice policy, but not the rendering of professional services under a landlord's policy, thus giving the insured the benefit of both worlds. *See D.D.*, 905 P.2d at 1368–70.

There is no Alaska case law directly on point, but courts from other jurisdictions have articulated a number of policy reasons for staying declaratory judgment actions until the proceedings in the underlying case are exhausted:

(1) The declaratory judgment action was not intended to be used to force the insured to have a "dress rehearsal" of an issue to be tried in the main case;

(2) The holding in the declaratory judgment action might inappropriately collaterally estop the parties to the main action as to certain factual issues;

(3) Such a proceeding would unduly burden the insured and improperly allow the insurer to wrest control of the litigation from the injured party;

(4) Such a declaratory judgment would violate the principle of judicial economy;

(5) Such an action would constitute an unwarranted interference with another court's proceedings; and

(6) To the extent the declaratory judgment might resolve an issue adversely to the insured, it would be inherently unfair to force the insured to litigate against the insurance company; under those circumstances, rather than obtaining the benefit of the company's resources and expertise in defending against the plaintiff, those resources, for which the insured had bargained, would be turned against the insured and used to help establish his or her liability.

*Morris*, 771 P.2d at 1211 (citing A. WINDT, INSURANCE CLAIMS AND DISPUTES § 804, at 326 (1982)). This Court finds the majority of these considerations problematic, but not without some force.

As we have seen, most tort cases are settled not tried. Unresolved coverage issues frequently prevent the parties from resolving the tort case on its merits. In this Court's experience, generally the settlement in such cases whether accomplished at a default hearing, a sham arbitration, or some form of assignment of rights by the insured to the plaintiff, depend on the hope that the insurer will have erred in handling the reservation of rights and thus lose the benefit of *CHI of Alaska* and be exposed to the adverse results set forth by the Alaska Supreme Court in *Sauer.* *See Sauer,* 841 P.2d at 184 (insurance company which wrongfully refused to defend is liable for the judgment that ensues even though the facts ultimately demonstrate that no indemnity is due). Thus, there is a strong argument for the proposition that questions of at least the duty to defend should be resolved before the tort suit is completed in order to enable the parties to realistically consider settlement in the tort case.

The Second Circuit makes a strong argument that the insurance company is entitled to an early determination of its duties to the insured before potential breach of those duties exposes it to claims of bad faith and breach of trust. *See Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 597 (2nd Cir.1996) (citing *Continental Cas. Co.,* 977 F.2d at 736–37). However, the Second Circuit does not unequivocally insist that an insurance coverage action must proceed even though the underlying claim is still pending and there is the possibility that the two litigations might result in simultaneous development of factual records and inconsistent factual determinations. Rather, in reversing the district court's dismissal of a declaratory action in *Continental Casualty Co.,* the Second Circuit disagreed with the lower court's assessment of potential conflicts, finding that "[a]lthough the claims ... arise from the same fact pattern, the legal and factual issues in the instant matter and state court litigation are different." *See* 977 F.2d at 737. Most relevant to this action, the court found that the underlying claim was very straightforward and would not result in a determination of facts necessary to determine the liability of the insurer. Because the "declaratory judgment action ... raise[d] issues that [were] central to the allocation of liability but [would] not be determined in the state court actions," *id.* at 737–38, the district court should have entertained the declaratory judgment action so as to "clarify and settle the central legal and factual issues arising out of [the declaratory judgment defendant's] conduct." *Id.* at 737. In this action, the overlap between the factual inquiry necessary to resolve the coverage dispute is substantially similar to the factual inquiry already underway in state court.

Duplicative litigation of the same factual issues in this Court and state court should be avoided. Of particular concern to this Court is the possibility that a holding in this declaratory action might collaterally estop the parties to the underlying tort action as to certain factual issues. Consideration of this factor weighs heavily in favor of the entry of a stay.

*Settling All Aspects of the Case.* The declaratory judgment action could resolve all aspects of the coverage dispute between National and Doe. In its present posture, it would not resolve any issues between the tort plaintiffs and the insured. Consideration of this factor does not support abstention, but does support the theory that this Court should enter a stay so as to allow the ongoing fact-finding process to run its full course in state court. The entry of a stay will avoid potential collateral estoppel problems that the parties have not fully considered.

*Clarifying the Legal Relations at Issue.* The purpose of a declaratory judgment is to resolve disputes and clarify the relations of the parties. The legal issues relating specifically to Doe's coverage and defense will not arise before the tort jury. The answers filed by the tort claimants and Doe in this proceeding assert affirmative defenses of estoppel, laches, waiver, bad faith, unclean hands, and Doe's reasonable expectations as to coverage. None of these will be addressed in state court. If there remains a significant coverage dispute in need of resolution after the litigation is complete in the underlying tort action, then this suit should be allowed to go forward.

*Discouraging Procedural Fencing and Actions Begun to Obtain a Res Judicata Advantage.* Again, this is not a "reactive" declaratory judgment action, or a race to the courthouse, as in *Brillhart.* Either party could have commenced a declaratory judgment action in either forum. Two years after the filing of the underlying tort complaint in state court, National elected to do so, whereas Doe has not.

Nonetheless, factual determinations reached in this coverage case may unfairly collaterally estop Doe in the underlying tort action. In *Morris,* the Supreme Court of Wyoming expressed concern that the holding in a declaratory judgment action might inappropriately collaterally estop the parties to the underlying tort action as to certain factual issues. *See* 771 P.2d at 1211. Similarly, California courts have expressed concern that if a declaratory relief action proceeds to judgment before the underlying action is resolved, the insured could be collaterally estopped to contest issues in the latter by the result in the former. *See David Kleis, Inc. v. Superior Court,* 37 Cal.App.4th 1035, 44 Cal.Rptr.2d 181, 187 (1995); *Haskel, Inc. v. Superior Court,* 33 Cal.App.4th 963, 39 Cal. Rptr.2d 520, 529 (1995). Consideration of this factor also favors the entry of a stay.

*Avoiding Entanglement Between the Federal and State Courts.* If this Court were to entertain National's declaratory action at this time, it might interject itself into the fact finding process already under way in state court. While it is likely that a coverage determination in this court would speed settlement of the tort case, this is not certain. Presently pending before the state Expert Advisory Panel are factual questions crucial to the ultimate issue of coverage in this action. For example, the Superior Court has requested that the Expert Advisory Panel answer the following: (1) whether it was negligent for Doe to conduct the in-take examination in question without the presence of a nurse and/or attendant; (2) whether it was negligent for Doe to conduct a limited breast examination of D.G. given her history of complaints; (3) whether the appropriate standard of care for a chiropractor requires that the chiropractor obtain the consent of the patient before conducting any examination of the breasts; (4) whether Doe negligently conducted the breast examination; (5) whether it was negligent for Doe to press down on D.G.'s pubic mound during her examination in order to determine whether her sacroiliac or lower lumbar region were implicated in the complaints she was presenting; and (6) whether it was negligent and/or inappropriate for Doe to advise D.G. to spread her legs, while taking the anterior lumbar view, "so that her thigh muscles would not interfere with the picture." *See* Docket No. 21, Exh. A.

Embarking on the same or substantially similar factual inquiries in federal court prior to a response from the Expert Advisory Panel would be inappropriate.

*Assessing the Convenience of the Parties.* This is a non-factor. All parties here are represented by local counsel in Anchorage. There is no rational basis for concluding that one forum is more convenient than the other for any of the litigants.

Finally, and of controlling importance, the Alaska Supreme Court has granted certification in *C.P. v. Allstate Insurance Co.,* Case No. J96–0017 CV (JKS), and will be addressing the precise question of the proper timing of a declaratory judgment action in an insurance coverage case and the underlying tort case. The Alaska Supreme Court will be considering the various opinions in *Montrose Chemical Corp.,* 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153, as well as a declaratory action's proper role under Alaska law in resolving coverage disputes between the insured and the insurer where the insured is sued in tort. The Alaska Supreme Court may decide that the declaratory judgment action should be stayed, or it may decide that the declaratory judgment action should go forward and be first resolved since it involves all of the parties and perhaps the major issues standing in the way of settlement. The court may even take some sort of an intermediate view. Until this Court knows the Alaska Supreme Court's decision, it cannot resolve the timing issue.

Taken together, the *Dizol* factors suggest that this Court should exercise its discretionary jurisdiction under the DJA and hear National's coverage claim, but only after the entry of a stay which will allow the parties to resolve common factual disputes in the tort action before they are addressed in this action. The parties can monitor progress in that case and if it settles or if it seems that a decision is being inordinately delayed, this Court can reevaluate the stay. If the Alaska Supreme Court in *C.P.* ultimately determines that a stay is not appropriate, this Court can accept that guidance.

The Court is especially concerned that this coverage dispute will turn on precisely the same factual issues at stake in the underlying tort action. It will be impossible to resolve National's coverage claim without first resolving whether Doe acted negligently or intentionally. National's declaratory judgment action places Doe in the difficult position of having to deny all liability in one action and at the same time establish that a reasonable jury could find that he was negligent. This Court declines to render any factual determinations at this time which might potentially collaterally estop the parties to the underlying tort action.[16]

Furthermore, National waited nearly two years before filing this declaratory action in federal court. The lengthy period of time during which National provided Doe with a defense under a reservation of rights undermines the assertion that National will suffer any substantial prejudice if a stay is entered. Nor is it clear that a declaratory judgment of no coverage would entitle National to withdraw its defense of Doe in the underlying tort action. A decision in *C.P.* will cast light on that issue. This further undercuts the assertion that National will suffer substantial prejudice.

**IT IS THEREFORE ORDERED:**

Doe's motion to dismiss or for stay (Docket No. 12) is **GRANTED.** A stay pending the outcome of the underlying state court litigation is hereby entered. During the stay, the Court will not render any determinations on factual or legal issues related to the ultimate issue in this declaratory action. However, discovery shall proceed. A scheduling and planning conference shall be held on **Thursday, October 29, 1998, at 4:00 p.m.,** during which time the Court and the parties shall discuss discovery needs in this action.

---

**16.** This Court recognizes that should the tort case go to trial, the parties might have to litigate the same issues before two juries, one in state court and one in federal court, and risk possibly inconsistent results. If this Court forges ahead, one jury trial might resolve all issues in a single proceeding. Whether this is true depends on whether plaintiffs and the insured are sufficiently adverse that a cross-claim would be mandatory. *See Drickersen,* 546 P.2d at 169–70.